UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------X
"JOHN DOE," a fictitious name,

        Plaintiff,

      -against-

CORY MAIER, GAVIN YINGLING, MICHAEL
HECKMULLER, DAVID BURKHARDT,
BRENNAN BECKER, CONNER CULIVER,
TIMOTHY HUGHES, MICHAEL SMOLENS,
JOHN FITZGERALD, GEOFF COCHRANE, and
JAMES ROES 1-25 (fictitious names),

        Defendants.
---------------------------------------------------------X

Docket No. _____

Related Cases Docket No.:
      17 CV 3514 (JS)(SIL)
      17 CV 3543
      17 CV 3639

ECF CASE

**COMPLAINT**

**Jury Demand**

     Plaintiff, **JOHN DOE**, a fictitious name, (hereinafter "Doe" or "Victim"), by his attorneys GALLO VITUCCI KLAR LLP and LAW OFFICES OF THOMAS M GRASSO LLC, allege for his Complaint against defendants, upon information and belief:

## INTRODUCTION

    1.    This is a civil action seeking compensatory and punitive damages for sexual battery, sexual assault, false imprisonment, intentional infliction of emotional distress, negligent infliction of emotional distress, willful misconduct, gross negligence, and negligence for conduct directed by defendants against plaintiff in 2016.

## PARTIES

    2.    Plaintiff-Victim, **JOHN DOE**, is and was at all relevant times a resident of the State of West Virginia and was enrolled as a "Plebe" student member of the United States Merchant

Marine Academy, located in Kings Point, New York (hereinafter "USMMA" or "the Academy"), Class of 2020, and a member of the USMMA Men's Soccer Team, from July to October 2016.

3.      Plaintiff brings this action on his own behalf and as agent and/or trustee on behalf of and for the interest of all parties who may be or become interested in the matters which are the subject of this case, as their respective interests may ultimately appear.

4.      Defendant, **CORY MAIER**, is and was at all relevant times a resident of the State of Virginia, was a "First Classman" and/or "senior" at the USMMA, and a member of the USMMA Men's Soccer Team when Plaintiff was enrolled, and formally graduated from the USMMA in November 2017.

5.      Defendant, **GAVIN YINGLING**, is and was at all relevant times a resident of the State of Maryland, was a "First Classman" and/or "senior" at the USMMA, and a member of the USMMA Men's Soccer Team when Plaintiff was enrolled, and formally graduated from the USMMA in November 2017.

6.      Defendant, **MICHAEL HECKMULLER**, is and was at all relevant times a resident of the State of California, was a "First Classman" and/or "senior" at the USMMA, and a member of the USMMA Men's Soccer Team when Plaintiff was enrolled, and formally graduated from the USMMA in November 2017.

7.      Defendant, **DAVID BURKHARDT**, is and was at all relevant times a resident of the State of New York, was a "First Classman" and/or "senior" at the USMMA, and a member of the USMMA Men's Soccer Team when Plaintiff was enrolled, and formally graduated from the USMMA in November 2017.

8.      Defendant, **BRENNAN BECKER YINGLING**, is and was at all relevant times a resident of the State of Florida, was a "First Classman" and/or "senior" at the USMMA, and a

member of the USMMA Men's Soccer Team when Plaintiff was enrolled, and formally graduated from the USMMA in November 2017.

9.      Defendant, **CONNER CULIVER**, is and was at all relevant times a resident of the State of Arizona, was a "First Classman" and/or "senior" at the USMMA, and a member of the USMMA Men's Soccer Team when Plaintiff was enrolled, and formally graduated from the USMMA in November 2017.

10.     Defendant, **TIMOTHY HUGHES**, is and was at all relevant times a resident of the State of New York, was a "First Classman" and/or "senior" at the USMMA, and a member of the USMMA Men's Soccer Team when Plaintiff was enrolled, and formally graduated from the USMMA in November 2017.

11.     Defendant, **MICHAEL SMOLENS**, is and was at all relevant times a resident of the State of New York, and at all relevant times in 2016 the Head Coach of the of the USMMA Men's Soccer Team when Plaintiff was enrolled.

12.     Defendant, **JOHN FITZGERALD**, is and was at all relevant times a resident of the State of New York, and at all relevant times in 2016 the Associate Head Coach of the of the USMMA Men's Soccer Team when Plaintiff was enrolled.

13.     Defendant, **GEOFF COCHRANE**, is and was at all relevant times a resident of the State of New York, and at all relevant times in 2016 an Assistant Coach of the of the USMMA Men's Soccer Team when Plaintiff was enrolled.


## JURISDICTION

14.     This Court has Diversity Jurisdiction pursuant to 28 U.S.C. §1332 because intervening plaintiff and defendants are diverse in citizenship and the amount in controversy

exceeds $75,000 exclusive of interest and costs, and 28 U.S. Code § 1367 (Supplemental Jurisdiction.

## **VENUE**

15.     Venue is proper in this Court because plaintiff and seven former student defendants were students at the USMMA at all relevant times, five of whom are New York residents and six of whom were plaintiffs in related cases and submitted to this Court's jurisdiction, and some of the events and conduct by all defendants upon which some of the causes of action are based occurred in the State of New York.

## **FACTS**

### *I.     Academy Policies and Regulations*

16.     The Academy is a four-year federal service academy operated under and by the United States Department of Transportation, Maritime Administration.

17.     In the 2016-2017 academic year, the mission of the Academy was, "*To educate and graduate licensed merchant mariners and leaders of exemplary character who will serve America's marine transportation and defense needs in peace and war.*"

18.     In the 2016-2017 academic year, the Academy's Policy Regarding Discrimination and Harassment, including Sexual Harassment and, Sexual Assault, as represented in the 2016-2017 Course Catalogue, provided as follows:

> a.  It is the policy of the U. S. Merchant Marine Academy to encourage the development and growth of all Midshipmen, faculty and staff in an environment that is free from discrimination and harassment, including sexual harassment and sexual assault. Discriminatory and harassing behavior creates a demeaning, intimidating, and hostile educational environment that undermines the basic principles of the Academy and, therefore, is not accepted or tolerated at our institution. It is the responsibility of all Midshipmen, faculty and staff to refrain

from such behavior, to discourage it wherever found and to promptly report any such behavior, as required in Superintendent Instruction 2016-02 (Sexual Assault, Dating Violence, Domestic Violence, Stalking, Prevention Education and Response Policy) and Superintendent's Instruction 2013-02 (Policy Against Discrimination and Harassment, Including Sexual Harassment, of Midshipman).

b. The Academy is dedicated to training men and women as future officers in the merchant marine and Armed Forces who must uphold and perpetuate the traditions of an honorable profession. Inappropriate conduct is corrosive to the cohesiveness, morale and esprit de corps of a military organization or a ship's company. All incidents of discrimination, including sexual harassment and sexual assault will be investigated by the Academy or the appropriate investigative agency having jurisdiction of the incident. All involved will be treated with dignity, fairness and respect. Sexual assault victims will be provided with victim advocacy services. If a violation is found, prompt and effective corrective action will be taken. The Academy provides training, education and awareness to minimize discrimination and harassment.

19.    In May 2016, Rear Admiral (RADM) JAMES A. HELIS, USMS, the Academy's Superintendent, promulgated Superintendent's Instruction 2016-02 (Sexual Assault, Dating Violence, Domestic Violence, Stalking, Prevention Education and Response Policy) ("SI-2016-02").

20.    SI-2016-02 applied to **all** Academy personnel, including Midshipmen, faculty, staff, and personnel of tenant agencies, whether Federal employees, military personnel or contract employees.

21.    SI-2016-02 applied:

i)    Both on and off Academy grounds and during duty and non-duty hours; and

ii)    To working, living, and recreational environments including both at the Academy, off the Academy grounds, and at sea.

22.    SI-2016-02 defined "Sexual Assault" as follows:

a. Sexual assault is a crime of violence defined as intentional touching of a sexual nature against the will (by use of force, physical threat, or abuse of authority) or without the consent of the victim. The victim of sexual assault can be male or female and the perpetrator of the sexual assault can be of the same or opposite sex. Sexual assault includes, but is not limited to, the following: i) Unwanted kissing, groping, fondling, or other more aggressive physical acts, such as rape, nonconsensual sodomy (oral or anal sex), or attempts to commit these acts; ii) Sexual contact with someone whom you reasonably should have known was impaired and, thus unable to consent, due to the use of alcohol or drugs (including prescription medications); iii) Sexual contact with someone who is "passed out," sleeping, or otherwise incapacitated; iv) Sexual contact with someone who is unable to say "no" and/or change their mind due to the presence of coercion or intimidation; and v) Sexual contact with someone who is under the age of consent in the jurisdiction in which the sexual assault occurs.

23.    The Academy promulgated Midshipman Regulations ("MR") in effect for the 2016-2017 academic year provided particular standards of behavior and relationships between midshipmen, and the treatment of junior midshipmen by senior midshipmen. The purpose of these regulations was to establish Academy policy governing the obligations, standards, and responsibilities of Midshipmen.

24.    The MR applied to **all** midshipmen at all times while enrolled at the Academy.

25.    MR §102 prohibited midshipmen from engaging in any activities which violate municipal, state, or federal laws.

26.    MR §104 required it the duty of each midshipman to comply with the MR and all other written or oral directives.

27.    MR §104(4)(b) imposed upon any Midshipman in a position of authority, including team captain, the duties to set a good example for subordinates in appearance, bearing, performance of duty, and personal conduct.

28.    MR. §201 required all midshipmen to conduct themselves, at all times, in a military manner and with the propriety and decorum which characterize socially accepted behavior,

particularly at any activity sponsored by the Academy or where a midshipman is acting as a representative of the Academy.

29.     MR §208 prohibited midshipmen from using contemptuous, disrespectful, or insolent language/gestures toward any other midshipman in an attempt to intimidate or defame.

30.     MR §212 required that the basis for relationships between the classes must be that of a proper professional relationship between seniors and juniors.  Such a relationship is based on the principles of regard for human dignity and personal respect.  Treatment of subordinates in a manner that degrades or humiliates is a violation of these principles.

31.     MR §212 required upper-class midshipmen to maintain proper professional relationships with fourth classmen at all times.

32.     MR §212 prohibited upper-class midshipmen from, *inter alia*:

a.   Attempting to degrade or humiliate fourth class midshipmen.

b.   Imposing any informal or unauthorized punishment.

c.   Touching a fourth class midshipman except for the purpose of correcting or adjusting uniform, drill or rifle position, or other legitimate training purpose.

33.     MR §214 prohibited Hazing in all its forms and defined it as any act committed against a candidate, plebe or midshipman that is humiliating, intimidating or demeaning, or endangers the health or safety of the person.  Hazing includes active or passive participation in such acts and occurs regardless of the willingness to participate.

34.     MR §214 required and imposed a duty on midshipmen to immediately report any instance of hazing to the Commandant of Midshipmen through the chain of command, Staff or Faculty.

35.   MR §216 prohibited all informal or unauthorized punishment; prohibited all Academy officers, staff or midshipmen from prescribing any punishment that is not acknowledged by the Regulations or authorized by the Commandant of Midshipmen; and imposed a duty upon all Academy officers, staff or midshipmen to report unauthorized punishment to the Commandant of Midshipmen through the chain of command.

36.   MR §221 prohibited all physical violence and intimidating behavior; prohibited midshipmen from striking or attempting to strike another person or encouraging someone to strike another person; prohibited all midshipmen from threatening another person or his/her property whether or not they intend to carry out such threats; and subjected all midshipmen to the Federal Laws and to the Criminal Code of the State of New York.

37.   MR §221 prohibited and did not tolerate intimidating behavior on the part of any midshipmen, especially in the case of upper classmen versus under classmen and provided same as a violation of MR §221 and §MR 212.

38.   MR §241 prohibited sexual misconduct by midshipmen and defined sexual misconduct as sexual acts at the Academy, on Academy vessels, on team movements, on board vessels assigned during sea training, or under circumstances that are discrediting to the Academy or the midshipman, or are prejudicial to good order and discipline in the Regiment of Midshipmen.

39.   MR §1109 provides the following as "Class I" Offenses:

   a.   (10) "Hazing" as forcing another person to do hard, humiliating, or unnecessary work in order to punish or harass. Hazing also includes the use of excessive physical or mental demands upon another individual. Example: Singling out a Fourth Classman for excessive verbal abuse by a group of upperclassmen.

b.  (15) Engaging directly or indirectly in physical violence towards another person.

c.  (16) Sexual misconduct as defined by the regulations.

## II.    Academy Men's Soccer Team Coaching Staff

40.    In the 2015-2016 and 2016-2017 academic years, the Academy men's soccer team was entered with the National Collegiate Athletic Association (NCAA) as a Division III team and placed in the "Skyline Conference".

41.    Defendant, **SMOLENS**, was registered with the NCAA as the Head Coach of the Academy men's soccer team for the 2015-2016 and 2016-2017 academic years.

42.    Defendant, **SMOLENS**, holds a United States Soccer Federation (USSF) "B" coaching license, and a National Soccer Coaches Association of America (NSCAA) advanced national coaching diploma.

43.    During his time as the Head Coach of the Academy men's soccer team, Defendant, **SMOLENS**, amassed an overall record of 316-157-39, making him the winningest coach in USMMA history.

44.    Defendant, **SMOLENS**, had been awarded NSCAA Regional Coach of the Year in 2002, 2004, and 2007, and Skyline Conference Coach of the Year on 10 occasions.

45.    Defendant, **SMOLENS**, was Head Coach of the Academy men's soccer team since 1990.  The 2016 season was his 27th year as Head Coach.

46.    In the 2016-2017 academic year, Defendant, **SMOLENS**, was also USMMA Associate Athletic Director for Internal Operations, where he oversaw compliance, scheduling, and academic affairs.

47.    In his roles as Head Coach and Associate Athletic Director for Internal Operations, Defendant, **SMOLENS**, had duties and was responsible for, *inter alia*, proper reporting to the Academy Athletic Department, the Commandant, and for ensuring compliance with NCAA standards and regulations, ensuring compliance with all U.S. Department of Transportation, Maritime Administration, and Academy policies, regulations and Superintendent's Instructions.

48.    Defendant, **FITZGERALD**, was the Associate Head of the Academy men's soccer team for the 2016-2017 academic year.

49.    In his role as Associate Head, Defendant, **FITZGERALD**, had duties and was responsible for, *inter alia*, proper reporting to the Academy Athletic Department, the Commandant, and for ensuring compliance with NCAA standards and regulations, ensuring compliance with all U.S. Department of Transportation, Maritime Administration, and Academy policies, regulations and Superintendent's Instructions.

50.    Defendant, **COCHRANE**, was Assistant Coach of the Academy men's soccer team for the 2016-2017 academic year.

51.    In his role as Assistant Coach, Defendant, **COCHRANE**, had duties and was responsible for, *inter alia*, proper reporting to the Academy Athletic Department, the Commandant, and for ensuring compliance with NCAA standards and regulations, ensuring compliance with all U.S. Department of Transportation, Maritime Administration, and Academy policies, regulations and Superintendent's Instructions.

### III.    *Conduct Directed at Plaintiff*

52.    In 2015 and 2016, Plaintiff met Defendant, **SMOLENS**, at a soccer tournament. Defendant, **SMOLENS**, observed him play, and recruited him to apply to the Academy to play on the men's soccer team.

53.     Defendant, **SMOLENS**, behaved in a cordial and encouraging manner to induce and persuade Plaintiff to apply to the Academy and play on the men's soccer team.

54.     Based upon Defendant, **SMOLENS's** outward behavior, Plaintiff believed that Defendant, **SMOLENS** would be a positive influence, that he cared about his well-being, and that he would look out for him.

55.     In April 2016, with other scholarship options available, Plaintiff chose to attend the USMMA and to play on the men's soccer team.

56.     On or about July 5, 2016, plaintiff was enrolled at the USMMA as a "Plebe," and was registered to play on the men's soccer team.

57.     During "Indoctrination", unusual drilling was imposed on plebes including Plaintiff.  In one instance a midshipman drill instructor ordered Plaintiff to the ground to do pushups.  The drill instructor placed his knee behind Plaintiff's head and forced him to push into his knee causing himself pain.

58.     In another Indoctrination incident, Plaintiff and others were instructed to brush their teeth in such a way to simulate that they were performing oral sex on a male.

59.     Immediately upon practicing with the men's soccer team, Defendant, **SMOLENS** initiated derogatory, disparaging, and demeaning statements about Plaintiff in front of the team players and coaches.

60.     Defendant, **SMOLENS** made Plaintiff the target of jokes and ridicule often with sexual innuendo and connotation and based upon Plaintiff's home state, West Virginia.

61.     Defendant, **SMOLENS's** derogatory comments included, but were not limited to, stating that Plaintiff was inbred, having sex with family members, and that his family lived in a trailer because Plaintiff was from West Virginia.

62.     Defendant, **SMOLENS's** comments 'opened the door' to Plaintiff's fellow team mates the impression that such comments were permitted and encouraged.

63.     Defendants said things to Plaintiff like, "*Hey ["Doe"] do you miss sleeping with your sister and Mom?*"

64.     Defendant, **SMOLENS** made fun of Plaintiff's family for living in an RV because they recently moved.

65.     Plaintiff believed the harassment was going to stop the first month, but the longer it went on, the more often and more hateful the soccer team coaches and players comments became.

66.     Plaintiff's soccer teammates, including Defendants, **MAIER**, **YINGLING** and **HECKMULLER**, joined Defendant, **SMOLENS**, in ridiculing Plaintiff with targeted, sexually offensive remarks and conduct, which spilled off the playing field and into the barracks.

67.     Soccer team members, including Defendants, **MAIER**, **YINGLING** and **HECKMULLER**, made and directed exually explicit remarks and drew pictures on whiteboards targeting Plaintiff and his family.

68.     Soccer team members, including Defendants, **MAIER**, **YINGLING** and **HECKMULLER**, used or directed use of red indelible ink "Sharpie" pens to draw sexually offensive pictures on Plaintiff's barracks desk.

69.     Soccer team members, including Defendants, **MAIER**, **YINGLING** and **HECKMULLER**, used or directed super-gluing Plaintiff's sandals to his barracks room floor.

70.     Defendant, **MAIER**, was the Battalion Training Officer, a Midshipman Officer position, at the time and made derogatory, demeaning and offensive comments to Plaintiff daily.

71.     The harassment got to a point where Plaintiff could not go to practice without the team making a comment about his family and that he did sexual things with them.

72.    Defendants continued to escalate and target harassment and abuse at Plaintiff during team practices, classes, in the barracks and everywhere. Plaintiffs own classmates began to make the derogatory comments as well.

73.    Plaintiff began to hate to leave his room and even go to dinner for the anxiety of having to face more and escalating harassment.

74.    Plaintiff was made anxious, miserable and depressed every day as a result of continuous barrage of sexually charged hazing and abuse directed at him.

75.    The verbal abuse and sexual attack affected Plaintiff's time with the soccer team but adversely affected his academic studies and social life as well.

76.    Plaintiff became distracted, worried, and could not keep his mind off what happened.

77.    Defendants knew or should have known that Plaintiff was being targeted for hazing and abuse.

78.    None of the Academy men's soccer team coaches or players took any action to stop or report the hazing and abuse of Plaintiff or render any assistance to Plaintiff.

79.    Plaintiff came to learn that the men's soccer team had a culture of hazing and abuse.

80.    Plaintiff was told by midshipmen in First Company that "things happened" at the back of the bus on the team trips and that plebes were targeted for abusive treatment.

81.    Plaintiff was warned by upper classmen, "do not use the bathroom" on team bus trips suggesting incidents of a sexual nature would occur including attempts to penetrate plebe players' anuses.

82.     Defendant former students directed third classmen to stand up to "make a wall" on the team bus to block incidents by the first classmen on plebes from view.  The defendant coaches knew or should have known of this tactic.

83.     On one occasion, Defendant, **MAIER**, transmitted a patently offensive email to Academy men's soccer team players, including Plaintiff, with photos of a USMMA plebe naked with the U.S. Coast Guard Academy bear mascot head being sexually defiled and ejaculated upon.

84.     On another occasion, Defendant, **MAIER**, threatened to urinate on Plaintiff's physics book if he brought it to study on the bus on men's soccer team trips.

85.     In the locker room shower, some men's soccer team members would urinate on the legs of other team members.

86.     The men's soccer team culture was also influenced by alcohol abuse, including excessive drinking in the park near the Academy and in the men's locker room on campus.

87.     Overall, the Academy men's soccer team culture was pervasively hostile and abusive, encouraging hazing, humiliation, and subjugation of plebes to the lewd whims of first class soccer players, encouraged, unchecked, and unreported by the coaching staff.


### IV.     *Sexual Battery of Plaintiff During Bus Trip to Baltimore*

88.     On September 2, 2016, the Academy men's soccer team was on a team bus trip to JOHNS HOPKINS UNIVERSITY to play in a tournament.

89.     All of the stated defendants were present on board the team bus for this trip.

90.     Plaintiff was being yelled at on the bus trip for almost anything. He placed in charge of movies on the bus and was repeatedly heckled and yelled at by first classmen, "F*** you

["Doe"]! F*** you ["Doe"]!" until the movie was put in.  The defendant team coaches were present at the front of the bus while this verbal berating occurred.

91.     The usual seating arrangement had Plaintiff seated with other plebes near the front of the bus in a row just behind the three coaches.  Third classmen were seated immediately behind the plebes, then second classmen behind them.  The seven former first class students, Defendants—**MAIER**, **YINGLING**, **HECKMULLER**, **BURKHARDT**, **BECKER**, **CULIVER**, and **HUGHES** – were seated near the back and adjacent to but forward of the lavatory.

92.     Defendants, **MAIER** and **YINGLING**, were seated across the aisle from each other, with Defendant, **HECKMULLER**, seated just forward, and Defendant, **CULIVER**, seated just behind them.

93.     In order to access the lavatory, Plaintiff would have to pass through all the defendants.

94.     The mood on the bus was hostile due to the ongoing berating and hazing directed at Plaintiff.

95.     After a practice session while the bus was in the City of Baltimore, Maryland, and while seated on the bus, Plaintiff was suddenly slapped in the face with a banana peel.

96.     Plaintiff threw the banana peel and hit upper classman, HANNES ROGERS, in the face.  Plaintiff apologized immediately and there was no problem with Mr. ROGERS.

97.     Defendants, **MAIER** and **YINGLING**, directed Plaintiff to the back of the bus to "have a talk."  Plaintiff complied, believing they actually wanted to have a conversation.

98.     Immediately upon reaching them, Defendants, **MAIER** and **YINGLING**, forcibly, against Plaintiff's will and without his consent, pushed Plaintiff to the floor and held him down.

99.     While Plaintiff was being forcibly restrained and held to the floor, Defendants, **MAIER** and **YINGLING**, pulled Plaintiff's boxers and shorts to my ankles, exposing him naked on the bus floor in full view, against his will and without his consent.

100.     While Plaintiff was being forcibly held down and restrained naked on the bus floor, Defendants, **MAIER** and **YINGLING**, forcibly tried to shove a banana and their fingers into Plaintiff's anus and privates, against Plaintiff's will and without his consent.

101.     While Defendants, **MAIER** and **YINGLING**, sexually battered Plaintiff, Defendant, **HECKMULLER**, either poured a foul-smelling liquid, possibly urine, onto Plaintiff or urinated onto Plaintiff's head, while yelling, "Plebe we told you to shave your pubes!"

102.     During the sexual battery attack, Plaintiff tried to get up and escape but was restrained and prevented from doing so by Defendants, **MAIER**, **YINGLING**, and **HECKMULLER**.

103.     After some time struggling, Plaintiff managed to break free of his attackers. When Plaintiff attempted to return to his seat running past Defendants, **MAIER** and **HECKMULLER**, they again tried shoving their fingers into Plaintiff's anus as he ran by.

104.     The entire sexual battery attack occurred in full view and in close proximity to all named Defendants, who knew or should have known that Plaintiff was attacked, yet none took any action to stop, prevent, interrupt or report the attack or render any aid to Plaintiff.

105.     The entire sexual battery attack occurred while the bus was in Baltimore, Maryland.

106.     Later, Defendants, **MAIER** and **YINGLING**, told Plaintiff of the attack occurred was that, "It happens to every plebe." This corroborated to Plaintiff the story he heard earlier about things happening to plebes on the back of the team bus and not to use the toilets.

107.    The attack on Plaintiff In the attack, subjected him to sexual battery & assault, false imprisonment, harassment, fear, intimidation, bullying, excessive and outrageous hazing, ridicule and embarrassment, and emotional distress.

108.    When Plaintiff returned to his seat, other plebes appeared to know something had happened.  One plebe, ALEX MADONNA, thought it was funny.

109.    Plaintiff was numb from the sexual battery attack and zoned out, placing his headphones on.

110.    As soon as Plaintiff got off the bus at the hotel, he was told how bad he smelled and was not spoken to by anyone.

111.    The rest of the bus trip no one said anything to Plaintiff about the attack.  Defendant, **SMOLENS**, insensitively played the song "Country Road" on his phone following the attack on Plaintif.


### V.    *Following the Sexual Battery on Plaintiff*

112.    Following the attack, Plaintiff was afraid to immediately report the incident due to fear of retribution and being ostracized.

113.    Also, at the time, a "Sea Year Stand Down" had been imposed on the Academy due to excessive incidents of sexual harassment and concern for the safety of midshipmen during their Sea Year.  Plaintiff believed that his report would prevent other midshipmen from shipping out for their required sea time, which would have further made him a target of abuse and harassment.

114.    Plaintiff continued his academic studies upon returning to the Academy.  However, he suffered fear, depression, and anxiety in fear of further attack and potential retribution.

115.    To deal with this situation, Plaintiff had to separate himself from his friends, quit the soccer team, and ultimately leave the school.

116.    Plaintiff got to the point where he hated going to classes because of the harassment he would have to endure.  Having to see the upperclassmen who have sexually battered him caused him great despair and misery.

117.    At least two other players also quit the men's soccer team after Plaintiff.

118.    After quitting the men's soccer team, Defendant, **MAIER**, continued to harass Plaintiff around campus.

119.    After quitting the soccer team, Plaintiff was visited by Defendant, **YINGLING**, in his barracks room, who tried questioning me about why Plaintiff quit, and what he was going to do about it, making Plaintiff very uncomfortable conversation and worried about retribution.

120.    Plaintiff decided to "resign" from the Academy, after completing the first semester final exams, unable to continue on in the face of the constant harassment.

121.    On October 28, 2016, Plaintiff filed a "Restricted Report" along with a personal statement with Commander (CDR) PAUL ACQUARO, USMS.

122.    Under the Academy's Sexual Assault/Sexual Harassment ("SASH") Policy, a restricted report protects the identity of the victim.  Plaintiff did not want his name to be reported back to his attackers or the team for filing a report for fear of retribution.

123.    CDR ACQUARO accepted Plaintiff's Restricted Report and personal statement and instructed Plaintiff how to depart the school without being identified as reporting an incident or resigning.

124.    Plaintiff departed the Academy shortly thereafter.

125.    Plaintiff suffered and continues to suffer severe post-traumatic stress and severe psychological and emotional distress including but not limited to anxiety, anguish, fear, severe depression, despair, hopelessness, sleeplessness, headaches, illness, severe mood swings and lashing out as a direct and proximate result of the extreme and outrageous conduct directed at him by all defendants during his first semester academic year 2016-2017.

## VI.    *Post Incident Proceedings*

126.    In February 2017, Plaintiff received a telephone call from the U.S. Department of Transportation's, Office of the Inspector General (OIG), informing him that his incident was under investigation in connection with aforementioned obscene photos transmitted by Defendant, **MAIER**.

127.    After giving a full account of the incident to OIG representatives, Plaintiff has not been provided any reports or evidence from the OIG investigation.

128.    The OIG subsequently contacted Plaintiff to inform him that his name and the incident may have been mentioned in a hearing in which the Academy and seven defendant soccer players were involved.

129.    Plaintiff was informed that his incident was referred to the U.S. Department of Justice, Assistant U.S. Attorney's Office, Eastern District of New York, for Grand Jury consideration.

130.    Subsequently, in June 2017, the seven defendant former soccer players were informed by the Academy that they were under investigation for an incident occurring on a soccer team bus and placed on "deferred graduation" status pending investigation.  This is the same incident upon which Plaintiff's complaint is based.

131.    The Academy withheld the graduation documents of the seven defendants pending investigation.

132.    The seven former soccer player defendants sued the United States, Department of Transportation, Maritime Administration, Superintendent RADM JAMES A. HELIS, and the Academy in U.S. District Court, Eastern District of New York, Docket No. 17 cv 03514 (JS)(SIL).

133.    The seven former soccer player defendants named Plaintiff publicly in their Court filings despite that Plaintiff's report was "Restricted" and that Plaintiff's name was not to be disclosed by Academy personnel to anyone including students.

134.    Upon information and belief, Defendant, **SMOLENS**, informed the seven former soccer player defendants that Plaintiff initiated an investigation and caused their graduation to be placed in jeopardy.

135.    In their court filings, the seven defendant former soccer players admit in their testimony that their behavior was "consistent with school tradition upper classmen teased the freshman members of the team."

136.    In their court filings, the seven defendant former soccer players deny in their testimony having directed any comments or conduct at Plaintiff, which directly conflicts with their testimony of behaving consistently with the tradition of "teasing" freshman team members.

137.    Based on the testimony contained in the court filings by the seven defendant former soccer players, there was a tradition of hazing and harassment, that it was common and accepted behavior, and that the soccer coaching staff condoned it and did nothing to prevent it.

138.    This conduct is in direct contravention of the Midshipman Regulations, Academy policy, and NCAA anti-hazing rules and policy.

139. The defendant coaches failed to report this hazing, sexual battery incident directed at Plaintiff to the NCAA despite being aware of the affirmative obligation to do so.

140. Defendant, **SMOLENS**, as the Head Coach of the men's soccer team and as Associate Athletic Director for Internal Operations with had the specific, affirmative duty to report hazing incidents, and the incident involving Plaintiff, to the NCAA but failed to do so.

141. The Academy' Superintendent, RADM HELIS, terminated the Academy men's soccer program and withdrew the Academy's entry for the 2017-2018 academic year.

142. Defendant, **SMOLENS**, was reassigned from Head Coach of the Academy men's soccer team to Head Coach of the Academy men's tennis team.

143. In July 2017, the Academy brought formal administrative charges against the seven former soccer player Defendants for various violations of the Midshipmen Regulations for the incident directed at Plaintiff on the team bus trip in Baltimore, Maryland, including:

    a. Penetrating or attempted to penetrate the anus of another with a banana;
    b. Bullying another by intimidating him through physical abuse and unreasonable verbal taunting;
    c. Hazing by humiliation and physical act by forcibly restraining, squirting water and/or urine and by covering with food;
    d. Hazing by creating an atmosphere of fear and intimidation among soccer team plebes who understood that they went to the first-class midshipman, quote, territory, unquote, territory in the back of the bus, that they would be subjected to humiliation by being forcibly restrained, squirted with water and/or urine and covered with food;
    e. Hazing by impairing the liberty of soccer team plebes who were not permitted to relieve themselves in the restroom located in the first-class midshipman, quote, territory, unquote, in the back of the soccer team because without fear of physical or mental abuse;
    f. Engaging in intimidation by creating a hostile atmosphere in which another was afraid to report this sexual assault on his person because of the continuing threat of reprisal;
    g. Engaging in conduct which reflected discredit on the Academy and the regiment of midshipman.

144.    In the Fall of 2017, the charges against the seven former soccer player defendants were adjudicated in formal Academy administrative proceedings.

145.    All seven former soccer player defendants received some sort of sanction as a result of the administrative proceedings which none of them appealed.

146.    In November 2017, the seven former soccer player defendants were administratively "graduated" from the Academy, receiving their Bachelor of Science degrees and U.S. Coast Guard documentation.

147.    It is unknown whether or not any of the seven former soccer player defendants were offered commission in the U.S. Naval Reserve.

148.    Subsequently, the seven former soccer player defendants dismissed their civil lawsuit.

149.    The Academy has reinstated the Academy men's soccer team and re-entered NCAA Division III competition in the Skyline Conference, but with a different Head Coach, ANDREW MCCARTHY.

150.    Defendant, **SMOLENS**, remains an employee of federal government.

## FIRST CAUSE OF ACTION:

## SEXUAL BATTERY AGAINST MAIER, YINGLING, AND HECKMULLER <u>FOR INCIDENT ON TEAM BUS IN BALTIMORE MARYLAND</u>

151.    Plaintiff repeats, realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 150 herein above.

152.    Defendants, **MAIER**, **YINGLING**, and **HECKMULLER**, intentionally, violently, forcibly, and without Plaintiff's consent, caused harmful and / or offensive sexual contact and personal injury upon Plaintiff by forcing him to the floor, pulling down his shorts and

underwear, exposing him naked, shoving and attempting to shove a banana and their fingers into the anus of Plaintiff while on the team bus in Baltimore, Maryland.

153.    Defendants, **MAIER**, **YINGLING**, and **HECKMULLER**, intended to cause and did cause Plaintiff harm by their contact with Plaintiff.

154.    Plaintiff suffered physical, psychological and emotional harm as a direct and proximate result of the intentional and harmful contact by Defendants, **MAIER**, **YINGLING**, and **HECKMULLER**.

155.    WHEREFORE plaintiff demands judgment in his favor and against each and all Defendants, **MAIER**, **YINGLING**, and **HECKMULLER**, jointly and severally, in the amount of $5,000,000.00 in compensatory damages, plus punitive damages, plus prejudgment interest at the New York Statutory interest rate of 9% per annum, costs, attorney fees, and such other and further relief as this Court deems just and proper.

## SECOND CAUSE OF ACTION:

### FALSE IMPRISONMENT AGAINST MAIER, YINGLING, AND HECKMULLER FOR INCIDENT ON TEAM BUS IN BALTIMORE MARYLAND

156.    Plaintiff repeats, realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 155 herein above.

157.    Defendants, **MAIER**, **YINGLING**, and **HECKMULLER**, intentionally, violently, forcibly, and without Plaintiff's consent and without any legal justification, deprived Plaintiff his liberty by pushing him to the floor, restraining him and preventing and resisting his escape, during a sexual battery while on the team bus in Baltimore, Maryland.

158.     Defendants, **MAIER**, **YINGLING**, and **HECKMULLER**, intended to cause and did cause Plaintiff harm and personal injury by restraining Plaintiff and depriving Plaintiff of his liberty without his consent or legal justification while they sexually battered him

159.     Plaintiff suffered physical, psychological and emotional harm as a direct and proximate result of the intentional and harmful contact by Defendants, **MAIER**, **YINGLING**, and **HECKMULLER**.

160.     WHEREFORE plaintiff demands judgment in his favor and against each and all Defendants, **MAIER**, **YINGLING**, and **HECKMULLER**, jointly and severally, in the amount of $5,000,000.00 in compensatory damages, plus punitive damages, plus prejudgment interest at the New York Statutory interest rate of 9% per annum, costs, attorney fees, and such other and further relief as this Court deems just and proper.

### THIRD CAUSE OF ACTION:

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### AGAINST DEFENDANTS MAIER, YINGLING, AND HECKMULLER
### <u>FOR INCIDENT ON TEAM BUS IN BALTIMORE MARYLAND</u>

161.     Plaintiff repeats, realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 158 herein above.

162.     The conduct Defendants, **MAIER**, **YINGLING**, and **HECKMULLER**, intentionally and purposely directed at Plaintiff on the team bus in Baltimore, Maryland, including the acts of sexual battery and false imprisonment, were intentional and/or reckless, extreme and outrageous, and caused the emotional distress experienced by the Plaintiff.

163.    Plaintiff suffers from severe emotional distress as a direct and proximate result of the conduct Defendants, **MAIER**, **YINGLING**, and **HECKMULLER**, directed at Plaintiff on the team bus in Baltimore, Maryland, including the acts of sexual battery and false imprisonment.

164.    The conduct Defendants, **MAIER**, **YINGLING**, and **HECKMULLER**, directed at Plaintiff on the team bus in Baltimore, Maryland, including the acts of sexual battery and false imprisonment, were beyond all possible bounds of decency and are regarded as atrocious, and utterly intolerable in a civilized community.

165.    Defendants, **MAIER**, **YINGLING**, and **HECKMULLER**, intended to cause the Plaintiff distress and were certain or substantially certain that such distress would result from their conduct.

166.    WHEREFORE plaintiff demands judgment in his favor and against each and all Defendants, **MAIER**, **YINGLING**, and **HECKMULLER**, jointly and severally, in the amount of $5,000,000.00 in compensatory damages, plus punitive damages, plus prejudgment interest at the New York Statutory interest rate of 9% per annum, costs, attorney fees, and such other and further relief as this Court deems just and proper.

## FOURTH CAUSE OF ACTION

### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### AGAINST ALL DEFENDANTS FOR ACTS AND OMISSIONS IN NEW YORK

167.    Plaintiff repeats, realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 166 herein above.

168.    All defendants had duties to conduct themselves in accordance with the Academy regulations and policies and societal norms, and specifically to refrain from, prevent, and report any conduct of hazing, harassment, bullying, intimidation, humiliation and hostile environment

and other aforementioned extreme and outrageous conduct against any other person including Plaintiff.

169.    All defendants knew or should have known that failure to conduct themselves in accordance with the Academy regulations and policies and societal norms, and specifically to refrain from, prevent, and report any conduct of hazing, harassment, bullying, intimidation, humiliation and hostile environment and other aforementioned extreme and outrageous conduct against any other person including Plaintiff, would cause Plaintiff emotional harm.

170.    All defendants breached their duties to conduct themselves in accordance with the Academy regulations and policies and societal norms, by failing to refrain from, prevent, and / or report the initiating, permitting, condoning, hazing, harassment, bullying, intimidation, humiliation and hostile environment and other aforementioned extreme and outrageous conduct against Plaintiff.

171.    The breach and failure of all defendants to conduct themselves in accordance with the Academy regulations and policies and societal norms, by failing to refrain from, prevent, and / or report the initiating, permitting, condoning, hazing, harassment, bullying, intimidation, humiliation and hostile environment and other aforementioned extreme and outrageous conduct against Plaintiff, was the direct and proximate cause of Plaintiff suffering severe emotional harm.

172.    WHEREFORE plaintiff demand judgment in his favor and against each and all defendants, jointly and severally, in the amount of $5,000,000.00 in compensatory damages, plus punitive damages, plus prejudgment interest at the New York Statutory interest rate of 9% per annum, costs, attorney fees, and such other and further relief as this Court deems just and proper.

## FIFTH CAUSE OF ACTION

### NEGLIGENCE AGAINST ALL DEFENDANTS FOR AGAINST ALL DEFENDANTS FOR ACTS AND OMISSIONS IN NEW YORK IN NEW YORK AND MARYLAND

173.    Plaintiff repeats, realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 172 herein above.

174.    All defendants had duties to conduct themselves in accordance with the Academy regulations and policies and societal norms, and specifically to refrain from, prevent, and report any conduct of hazing, harassment, bullying, intimidation, humiliation and hostile environment and other aforementioned extreme and outrageous conduct against any other person including Plaintiff.

175.    All defendants knew or should have known that failure to conduct themselves in accordance with the Academy regulations and policies and societal norms, and specifically to refrain from, prevent, and report any conduct of hazing, harassment, bullying, intimidation, humiliation and hostile environment and other aforementioned extreme and outrageous conduct against any other person including Plaintiff, would cause Plaintiff severe emotional harm.

176.    All defendants breached their duties to conduct themselves in accordance with the Academy regulations and policies and societal norms, by failing to refrain from, prevent, and / or report the initiating, permitting, condoning, hazing, harassment, bullying, intimidation, humiliation and hostile environment and other aforementioned extreme and outrageous conduct against Plaintiff.

177.    The breach and failure of all defendants to conduct themselves in accordance with the Academy regulations and policies and societal norms, by failing to refrain from, prevent, and / or report the initiating, permitting, condoning, hazing, harassment, bullying, intimidation,

humiliation and hostile environment and other aforementioned extreme and outrageous conduct against Plaintiff, was the direct and proximate cause of Plaintiff suffering severe emotional harm.

178.    WHEREFORE plaintiff demand judgment in his favor and against each and all defendants, jointly and severally, in the amount of $5,000,000.00 in compensatory damages, plus punitive damages, plus prejudgment interest at the New York Statutory interest rate of 9% per annum, costs, attorney fees, and such other and further relief as this Court deems just and proper.


Dated:  Woodbury, New York                    Attorneys for Plaintiff
        August 31, 2018

                                       By:    _____
                                              Richard González, Esq. (RG9291)
                                              **Gallo Vitucci Klar LLP**
                                              100 Crossways Park West, Suite 305
                                              Woodbury, NY 11797
                                              Tel: 212-683-7100
                                              Fax: 516-226-1525
                                              Email: rgonzalez@gvlaw.com
                                              www.gvlaw.com



Dated:  August 31, 2018                        Attorneys for Plaintiff


                                       By:    _/s/_____
                                              Thomas M. Grasso, Esq. (TG3737)
                                              **Law Offices of Thomas M Grasso LLC**
                                              8 Willow Street
                                              Cranford, New Jersey 07016-1855
                                              Tel: 908-514-8850
                                              Email: tom@tmgrassolaw.com



Of Counsel:

David E. Schneider, Esq.